# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 12-70035

MOISES SANDOVAL MENDOZA,

*Petitioner-Appellant,*

– v. –

BOBBY LUMPKIN, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

*Respondent-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS, TEXARKANA DIVISION, NO. 5:09-CV-86

## BRIEF FOR PETITIONER-APPELLANT

Anton Metlitsky
O'MELVENY & MYERS LLP
Seven Times Square
New York, New York 10036
(212) 326-2291
ametlitsky@omm.com

Jason Zarrow
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
(213) 430-8367
jzarrow@omm.com

Melissa C. Cassel
O'MELVENY & MYERS LLP
Two Embarcadero Center
San Francisco, California 94111
(415) 984-8839
mcassel@omm.com

*Counsel for Petitioner-Appellant Moises Sandoval Mendoza*

## ORAL ARGUMENT SCHEDULED
## ***THIS IS A CAPITAL CASE***

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described by Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Applicant-Petitioner-Appellant:**

Moises Sandoval Mendoza
*Represented by* O'Melveny & Myers LLP
Anton Metlitsky
Jason Zarrow
Melissa Cassel
Evan Hindman

*Previously Represented by*
Lydia Brandt
Jeff Haas
John Tatum
Pam Lakatos
Juan Sanchez
Angela Tucker
Vivaan Nehru
Kristin Marshall

**Respondent-Appellee:**

Bobby Lumpkin, Director, Texas Department of Criminal Justice Correctional Institutions Division
*Represented by*
Ali Mustapha Nasser
Natalie Thompson
Attorney General's Office

*Previously Represented by*
Tomee Heining

/s/ *Jason Zarrow*

i

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled oral argument for Tuesday, May 2, 2023 at 2:00 p.m.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..........................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................... ii

INTRODUCTION ..........................................................................................1

STATEMENT OF JURISDICTION....................................................................3

STATEMENT OF ISSUES ...............................................................................4

STATEMENT OF THE CASE............................................................................4

    A.    The Death Penalty in Texas ..............................................................4

    B.    State Proceedings .............................................................................5

        1.    Offense and guilt phase..........................................................5

        2.    Punishment phase..................................................................5

        3.    State post-trial proceedings...................................................15

    C.    Federal Proceedings .......................................................................16

SUMMARY OF ARGUMENT .........................................................................19

STANDARDS OF REVIEW .............................................................................20

ARGUMENT .................................................................................................21

I.    MENDOZA IS ENTITLED TO HABEAS RELIEF BASED ON
TRIAL COUNSEL'S PRESENTATION OF VIGEN ...................................21

    A.    Trial Counsel's Presentation Of Vigen Was Ineffective...................21

        1.    Counsel's presentation of an expert witness who proved
the prosecution's case for death was objectively
unreasonable..........................................................................22

        2.    Counsel's presentation of Vigen was severely prejudicial......32

    B.    State Habeas Counsel's Ineffectiveness Excuses Mendoza's
Procedural Default..........................................................................37

        1.    Mendoza's IATC claim is substantial.....................................38

        2.    Mendoza's state habeas counsel was ineffective for
defaulting his substantial IATC claim ...................................39

## TABLE OF CONTENTS
## (continued)

**Page**

II.   IN THE ALTERNATIVE, THE COURT SHOULD REMAND FOR
      ENTRY OF A *RHINES* STAY......................................................................47

CONCLUSION......................................................................................................50

CERTIFICATE OF SERVICE ..............................................................................51

CERTIFICATE OF COMPLIANCE......................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Andrus v. Texas*,
  140 S. Ct. 1875 (2020) ..................................................................... 25, 29, 31, 32

*Arizona v. Fulminante*,
  499 U.S. 279 (1991) ............................................................................35

*Ayestas v. Davis*,
  933 F.3d 384 (5th Cir. 2019)...............................................................41

*Blake v. Baker*,
  745 F.3d 977 (9th Cir. 2014)...............................................................49

*Bolin v. Baker*,
  994 F.3d 1154 (9th Cir. 2021) ............................................................49

*Buck v. Davis*,
  580 U.S. 100 (2017)..................................................................... passim

*Buntion v. State*,
  482 S.W.3d 58 (Tex. Crim. App. 2016)...............................................29

*Cargle v. Mullin*,
  317 F.3d 1196 (10th Cir. 2003) ..........................................................44

*Clark v. Davis*,
  850 F.3d 770 (5th Cir. 2017)................................................................4

*Coleman v. Thompson*,
  501 U.S. 722 (1991)............................................................................40

*Combs v. Coyle*,
  205 F.3d 269 (6th Cir. 2000)........................................................ passim

*Crustinger v. Stephens*,
  576 F. App'x 422 (5th Cir. 2014) ........................................................38

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Davila v. Davis*,
  137 S. Ct. 2058 (2017) ..................................................................... 40, 42, 46, 47

*Diaz v. Quarterman*,
  228 F. App'x 417 (5th Cir. 2007) .........................................................................43

*Dorsey v. Vandergriff*,
  30 F.4th 752 (8th Cir. 2022) .................................................................................38

*Estrada v. State*,
  313 S.W.3d 274 (Tex. Crim. App. 2010).......................................... 11, 28, 30, 36

*Ex Parte Mendoza*,
  2009 WL 1617814 (Tex. Crim. App. June 10, 2009).........................................15

*Flores v. Johnson*,
  210 F.3d 456 (5th Cir. 2000)......................................................................... 34, 35

*Gonzales v. Thaler*,
  643 F.3d 425 (5th Cir. 2011)................................................................................20

*Henderson v. Cockrell*,
  333 F.3d 592 (5th Cir. 2003)................................................................................20

*Hinton v. Alabama*,
  571 U.S. 263 (2014)..............................................................................................28

*Hooper v. Mullin*,
  314 F.3d 1162 (10th Cir. 2002) ...........................................................................35

*Johnson v. Bagley*,
  544 F.3d 592 (6th Cir. 2008)................................................................................29

*Jones v. Barnes*,
  463 U.S. 745 (1983)..............................................................................................46

*Lesko v. Sec'y Pa. Dep't of Corr.*,
  34 F.4th 211 (3d. Cir. 2022)...................................................................................3

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Magill v. Dugger*,
824 F.2d 879 (11th Cir. 1987) ............................................................27

*Mamou v. Davis*,
742 F. App'x 820 (5th Cir. 2018) .......................................................39

*Manley v. Ross Corr. Inst.*,
314 F. App'x 776 (6th Cir. 2008) .......................................................31

*Martinez v. Ryan*,
566 U.S. 1 (2012) ........................................................................ passim

*Mendoza v. State*,
2008 WL 4803471 (Tex. Crim. App. Nov. 5, 2008) ............................... 5, 12, 15

*Mendoza v. Stephens*,
783 F.3d 203 (5th Cir. 2015)..............................................................17

*Miller v. Dretke*,
420 F.3d 356 (5th Cir. 2005)..............................................................32

*Miller-El v. Cockrell*,
537 U.S. 322 (2003) ..........................................................................38

*Moore v. State*,
935 S.W.2d 124 (Tex. Crim. App. 1996).................................... 24, 25

*Murphy v. Davis*,
732 F. App'x 249 (5th Cir. 2018) .................................................. 38, 41

*Nelson v. Davis*,
952 F.3d 651 (5th Cir. 2020)..............................................................39

*Newbury v. Stephens*,
756 F.3d 850 (5th Cir. 2014)..............................................................39

*Owens v. Stirling*,
967 F.3d 396 (4th Cir. 2020)..............................................................39

vii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Ramey v. Davis,*
  942 F.3d 241 (5th Cir. 2019)....................................................................38

*Renteria v. State,*
  206 S.W.3d 689 (Tex. Crim. App. 2006)...............................................27

*Rhines v. Weber,*
  544 U.S. 269 (2005) .................................................................... 3, 21, 49

*Rhodes v. Vannoy,*
  751 F. App'x 524 (5th Cir. 2018) ...........................................................20

*Richards v. Quarterman,*
  566 F.3d 553 (5th Cir. 2009).......................................................... 22, 45

*Rompilla v. Beard,*
  545 U.S. 374 (2005) ...................................................................... passim

*Ruiz v. State,*
  2011 WL 1168414 (Tex. Crim. App. Mar. 2, 2011)............................11

*Shinn v. Ramirez,*
  142 S. Ct. 1718 (2022) ...................................................................3, 18

*Simmons v. Napier,*
  626 F. App'x 129 (6th Cir. 2015) ...........................................................45

*Smith v. Robbins,*
  528 U.S. 259 (2000) ........................................................ 43, 45, 46, 47

*Speer v. Lumpkin,*
  860 F. App'x 66 (5th Cir. 2021) ...............................................................3

*Stevens v. McBride,*
  489 F.3d 883 (7th Cir. 2007)..................................................................35

*Strickland v. Washington,*
  466 U.S. 668 (1984) ..................................................... 22, 23, 32

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Trevino v. Davis*,
   861 F.3d 545 (5th Cir. 2017)....................................................................38

*Trevino v. Thaler*,
   569 U.S. 413 (2013) ............................................................... 2, 37, 38

*United States v. Jones*,
   930 F.3d 366 (5th Cir. 2019)..................................................................35

*Washington v. Davis*,
   715 F. App'x 380 (5th Cir. 2017) ........................................................41

*White v. Thaler*,
   610 F.3d 890 (5th Cir. 2010)........................................................ 29, 34

*Wiggins v. Smith*,
   539 U.S. 510 (2003) ............................................................... 22, 33, 39

*Woodfox v. Cain*,
   609 F.3d 774 (5th Cir. 2010)..................................................................28

## Statutes

28 U.S.C. § 1291 ........................................................................................3

28 U.S.C. § 1331 ........................................................................................3

28 U.S.C. § 2106 ........................................................................................3

28 U.S.C. § 2244(b)(3)...............................................................................3

28 U.S.C. § 2253 .....................................................................................3, 19

28 U.S.C. § 2254 ........................................................................................3

Tex. Code Crim. Proc. art. 37.071, § 2(b)(1)............................................4

Tex. Code Crim. Proc. art. 37.071, § 2(d)(2)............................................5

Tex. Code Crim. Proc. art. 37.071, § 2(e)(1)........................................4, 26

ix

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Tex. Code Crim. Proc. art. 37.071, § 2(f)(2) .............................................................5

Tex. Code Crim. Proc. art. 37.071, § 2(g) ..................................................................5

**Professional Guidelines**

American Bar Association Guidelines for the Appointment and
    Performance of Defense Counsel in Death Penalty Cases, 31
    Hofstra L. Rev. 913 (2003) ........................................................................... passim

Fed. Jud. Ctr., *Resource Guide for Managing Capital Cases* § II.C,
    2004 WL 1873850 (2004).....................................................................................33

Guidelines and Standards for Texas Capital Counsel, 69 Tex. B.J. 966
    (2006) ............................................................................................................ 29, 40

## INTRODUCTION

Petitioner Moises Mendoza was sentenced to death because his attorneys failed him. With Mendoza's life hanging in the balance, his defense counsel presented as their star witness a psychologist who testified that Mendoza lacks a moral "compass," that the "traditional" factors in mitigation were "just not present," and that Mendoza was "very dangerous" to society. This damning testimony proved the prosecution's case, shattered Mendoza's defense, and ultimately condemned Mendoza to die. To state the obvious: "No competent defense attorney would introduce such evidence about his own client." *Buck v. Davis*, 580 U.S. 100, 119 (2017).

These errors were as clear during Mendoza's trial as they are today. Indeed, the prosecution argued in closing that this defense expert, Dr. Mark Vigen, proved both special issues required for the death penalty—i.e., that Mendoza posed a continuing threat to society and that there were no mitigating circumstances that warranted sparing Mendoza's life. Vigen's testimony that Mendoza was "dangerous in society," the prosecution told the jury, "answer[ed]" the future dangerousness "question." And Vigen's inability to "find someone, something that caused [Mendoza]" to commit murder provided "[t]he answer" to the mitigation question. Vigen, it turned out, was the star witness for the prosecution, prejudicing any chance Mendoza had for even one vote against a death sentence.

1

In granting Mendoza a certificate of appealability (COA), the Court has recognized that Mendoza's claim is substantial. Yet state habeas counsel defaulted the claim in state habeas proceedings by omitting it from her petition. This was ineffective assistance. State habeas counsel has an obligation to preserve substantial claims, and there is no possible strategic explanation for counsel's omission here. She did not, for example, strategically winnow claims from her petition; on the contrary, she asserted multiple claims that are far weaker than this one. Thus, under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), there is no procedural impediment to this Court granting Mendoza relief on his meritorious ineffective-assistance-of-trial-counsel (IATC) claim. Mendoza's application for a writ of habeas corpus should be granted, and the district court's contrary decision should be reversed.

If the Court grants Mendoza relief based on counsel's presentation of Vigen, there is no need to consider any of counsel's other errors. But one is particularly relevant here. Counsel's presentation of Vigen invited rebuttal on Mendoza's jail record. Yet neither trial counsel nor state habeas counsel investigated the most significant aspect of that record: Mendoza's alleged attack on another inmate. Because of these failures, Mendoza was not able to assert a failure-to-investigate claim until he was appointed counsel in federal court—at which point, under intervening Supreme Court precedent, it was too late for federal litigation.

Under *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), federal habeas review is limited to the state court record. But the evidence supporting Mendoza's failure-to-investigate claim is not part of the state court record precisely because he was hampered by ineffective counsel. Now, Mendoza's only opportunity to litigate the claim is to return to state court under the procedure set out in *Rhines v. Weber*, 544 U.S. 269 (2005). Mendoza satisfies all the elements under *Rhines*, so the Court should remand for entry of a *Rhines* stay, which would give Mendoza his only opportunity to litigate his failure-to-investigate claim on the merits.

This Court should reverse the district court's denial of habeas relief or vacate with instructions to enter or consider entering a *Rhines* stay.

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. §§ 2253 and 1291. The district court had subject matter jurisdiction over Mendoza's application for a writ of habeas corpus under 28 U.S.C. §§ 2254 and 1331. This Court is authorized to remand to the district court to enter or consider entering a *Rhines* stay by 28 U.S.C. § 2106.[1]

---

[1] Respondent opposed Mendoza's application for a COA on the ground that the claims at issue here were raised in a "second or successive" petition within the meaning of 28 U.S.C. § 2244(b)(3). *See* COA Opp., Part IV. To the extent this Court has not already rejected Respondent's argument by granting a COA, the argument fails for the reasons set out in Mendoza's COA Reply Brief at 27-30; *see also Speer v. Lumpkin*, 860 F. App'x 66 (5th Cir. 2021) (reaching merits after identical *Martinez/Trevino* remand); *see also Lesko v. Sec'y Pa. Dep't of Corr.*, 34 F.4th 211, 227 n.9 (3d. Cir. 2022) (holding that "where a conflict of interest … makes it impossible to bring a claim of trial ineffectiveness in a first habeas petition, that claim is not second or successive when raised in

## STATEMENT OF ISSUES

This appeal presents three issues:

1. Whether Mendoza's trial counsel rendered ineffective assistance when they presented an expert who proved the prosecution's case for death;

2. Whether state habeas counsel's procedural default of this substantial IATC claim is excused under *Martinez* and *Trevino* by counsel's ineffectiveness in failing to raise it;

3. Whether the Court should remand to the district court to stay, or consider staying, federal habeas proceedings to ensure that Mendoza has one full and fair opportunity to litigate the merits of his substantial claim that trial counsel failed to investigate the prosecution's key rebuttal witness at the punishment phase.

## STATEMENT OF THE CASE

### A.     The Death Penalty in Texas

If a defendant has been found guilty of capital murder, the jury may impose a death sentence only after making findings on two special issues.  First, the jury must find beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  Tex. Code Crim. Proc. art. 37.071, § 2(b)(1).  Second, the jury must find that there are no "mitigating circumstance[s] … to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed."  *Id*. § 2(e)(1); *see also* RR25:18-19.[2]

---

a subsequent petition with new counsel"); *Clark v. Davis*, 850 F.3d 770, 779-80 & nn.41-42 (5th Cir. 2017) (Rule 60(b)(6) motion not barred by § 2244 where capital petitioner could not have asserted the claim before judgment because counsel had a conflict of interest).

[2] This brief uses the following citation conventions:  ROA.# denotes the record on appeal; RR#:#

The jury must find both special issues unanimously. Tex. Code Crim. Proc. art. 37.071, §§ 2(d)(2), (f)(2). If even one of Mendoza's jurors had dissented on a single special issue, Mendoza could not have been sentenced to death. *Id*. § 2(g).

### B.    State Proceedings

#### 1.    *Offense and guilt phase*

The underlying facts of the offense are laid out in the Texas Court of Criminal Appeals's opinion. *See Mendoza v. State*, 2008 WL 4803471 (Tex. Crim. App. Nov. 5, 2008). In brief, Rachelle Tolleson was found dead in Farmersville, Texas in March 2004. *Id*. at *1-2. The police arrested Mendoza, *id*.; RR19:31-32, then only 20 years old, 1:SCHR:122. Mendoza confessed to murder while in custody. RR20:193-224; *see Mendoza*, 2008 WL 4803471, at *2. The trial court appointed Angela Tucker and Juan Sanchez to represent him. ROA.638. The jury found Mendoza guilty of capital murder. *See Mendoza*, 2008 WL 4803471, at *3-5.

#### 2.    *Punishment phase*

a. The defense case. Trial counsel's defense at the punishment phase centered on a promise to the jury to "present" mitigating evidence that would "explain why Moises Mendoza acted the way he did." RR23:10; RR23:9 ("There will be many reasons that you will find to explain his conduct."). Key to that promise was Vigen. According to counsel, their "strategy [was] to present [their] defense through Dr.

---

denotes the state trial record, volume, and page number; #:SCHR:# denotes the volume of the state court habeas record and page number.

Vigen." ROA.639. They thus positioned Vigen as the "focal expert" and primary "testifying witness" for Mendoza's defense. ROA.639, ROA.642. Counsel's presentation of Vigen, however, turned him into the star witness for *the prosecution*.

No internal compass. At its core, a death penalty case involves a moral assessment about the worth of a human life. Yet the first opinion that defense counsel elicited from Vigen dehumanized Mendoza completely. Vigen told the jury that Mendoza lacks "the internal compass that each of us has" and that he "has no … inner self" and "no clear inner identity." RR24:117-18. This inner identity defines "who we are and what we're about." RR24:118. And absent this identity, we have no "ability … to connect with other people in a way that we know who they are … and know how they feel." *Id*. This is "the core of personality," Vigen testified, but unlike the rest of "us," Mendoza does not have it. *Id*.; *see also* RR24:130 (there's "an emptiness inside him").

No mitigation. In addition to humanizing a capital defendant, competent defense counsel should identify, through their witnesses, mitigating facts that "explain or lessen the [defendant's] culpability." American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines), 31 Hofstra L. Rev. 913, 1055-56, 1058 (2003). Yet Vigen repeatedly testified that traditional mitigating factors were absent. Prompted by defense counsel, Vigen testified that "there aren't those traditional

6

things that we … more often than not see which … are traumatic to an individual which contribute to his aberrant behavior of taking another person's life." RR24:188. Thus, Vigen told the jury, "[t]here's something missing in this case for me as a psychologist. … [T]hose general factors [in mitigation] are just not present." RR24:187; *see also, e.g.*, RR24:154-56 (same).

Consistent with this position, Vigen's testimony painted a picture of Mendoza as someone who made a choice to commit murder. Despite opining that Mendoza's family was "psychologically dysfunctional," RR24:121, Vigen testified that Mendoza had "a good family," that his "parents worked very hard to do the very best they could," that Mendoza's siblings were "responsible" and "d[id] well in … life," and that Mendoza "had several great role models." RR24:121, 155-58. Vigen thus testified that Mendoza "could have chosen" to live a "responsible" life, "pattern[ing] his life after his brother, for example," RR24:156-57, but "[s]ometimes the kids [don't] listen," even when, like Mendoza, they come from a "good family," RR24:121 ("Parents don't control what children come and take from them.").

Vigen likewise opined that Mendoza and his friends chose "a depraved and disrespectful, aggressive and drug and alcohol lifestyle in which … empty sexuality was involved." RR24:126. It is difficult to comprehend how an opinion characterizing a defendant's life as "depraved" could ever be helpful in a capital case. It certainly was not helpful here. To Vigen's knowledge, none of Mendoza's

7

friends had committed similar crimes, RR24:169, underscoring the conclusion that Mendoza's choices, not his environment, pushed him to commit murder.

Vigen's mitigation-related testimony might be understandable if there was nothing that mitigated Mendoza's responsibility for his crime.  But as Respondent repeatedly has acknowledged in this case, the facts here actually form "a very compelling case for mitigation."  ROA.2025; COA Opp. at 34 (same); *see* RR24:57 (Vigen explaining that typical mitigation factors include "neurological trauma or abuse," "sexual abuse," and "chemical dependency").

For example, after acknowledging that "severe mental illness" ran in Mendoza's family, RR24:74, defense counsel could have had Vigen put Mendoza's own mental-health struggles in context—but they did not.  As Mendoza's fact witnesses established, he suffered at times from severe depression and even contemplated suicide.  *See* RR23:22; *see also* RR23:231 ("so depressed, he felt he didn't want to live anymore"); RR23:229 ("There was some times when he would say that he wanted just to take his life.").   Mendoza's depression likely found its roots in a debilitating injury Mendoza's father suffered during his childhood.  *See* RR23:84-87; RR23:141-42.   Unable to work, Mendoza's father spiraled into a "[s]evere depression," RR23:93, "withdr[ew] from the family," RR23:86-87, and attempted suicide multiple times, RR23:142-45.   His father's depression and withdrawal from family life clearly "affected" Mendoza.   RR23:90; *see also*

8

RR23:144-45.  Mendoza's friends and family saw his struggles and tried to get him professional help, but to no avail.  RR23:22-25, 110-11, 116-17.

Given Mendoza's mental-health issues, counsel also could have used Vigen to place Mendoza's drug and alcohol use in context:  there is a compelling narrative that Mendoza was self-medicating.  Instead, Vigen opined only that Mendoza's "behavior changed radically for the worse when he began smoking marijuana and drinking."  RR24:123-25.

Reasonable lawyers, moreover, would have used Vigen to emphasize Mendoza's positive attributes and redeeming qualities.  Witnesses who know Mendoza testified that he was bright, RR23:134, participated in sports, RR23:99-100, and "was involved in the church," RR23:101-02.  Stacie Garcia, one of Mendoza's best friends, testified to his remorse, detailing his confession to her and in church.  *See* RR23:16-21 (when he confessed to Garcia, Mendoza was "shaking" and "trembling" so badly that "the whole car was moving").  Mendoza's priest likewise testified that Mendoza was "very upset" when he came and gave confession and that Mendoza's "demeanor and attitude" had improved once he was in jail and on medication.  RR23:41-43.

Rather than amplify this testimony, Vigen disregarded it and told jurors to do the same.  In fact, he testified that Mendoza's remorse was only "superficial" and that Mendoza did not have "a very good understanding" of the "tremendous

9

seriousness of [his crime], that a person's life is gone because of him." RR24:130-31. Vigen also impugned Mendoza's character *repeatedly*,[3] in stark terms that the prosecution echoed in its closing. *Infra* at 16-18.

Finally, defense counsel could have asked Vigen to bring his expertise to bear on two critical but unexplained pieces of mitigation evidence in the trial record. One is that Mendoza may have been sexually abused by an older male cousin. RR23:146-49 ("he was wearing nothing but his underwear and trying to embrace Moises"); *see also* RR23:104-06. The other is that Mendoza's family may have repressed his sexuality. RR23:179-82 ("He would play around with … feminine clothes, you know. And I told him, what are you doing? Take that off, you know. … [T]he gay and lesbian lifestyle is accepted in our society, but with our religious beliefs, it's not accepted."); RR23:147 (Mendoza's father: "For me that was something that could not happen. A man embracing another man."). But counsel never explained how this evidence related to their case for mitigation and Vigen all but told the jury to ignore it.

---

[3] *See, e.g.*, RR24:120 ("He bo[a]sts about getting away with things, about being sneaky, about not getting caught."); *id.* ("[H]e's a nuisance."); *id*. ("He causes trouble."); *id*. ("He gets himself into trouble."); *id.* ("He often reacts to criticisms ... with anger when he perceives that somebody is criticizing him …. or if he doesn't get what he wants."); RR24:120-21 ("automatic reactivity"); RR24:121 ("He's just reacting and reacting and reacting."); RR24:126 ("depraved and disrespectful"); RR24:150 ("pattern of chronic lying"); RR24:151 ("explosive temper"); *id*. ("acts without thinking"); *id*. (acts "[w]ithout considering the consequences"); RR24:152 ("he's angry and acting out"); *id*. ("taunting behavior, nuisance, aggressive, verbal – verbal aggressive behavior"); RR24:168 ("empty sexuality"); RR24:175 ("sneaky and resourceful").

Future dangerousness.    Under Texas law, the future dangerousness special issue asks whether a defendant poses a danger to society, broadly defined; it is not limited to the defendant's likely dangerousness within the confines of prison. *See, e.g.*, *Ruiz v. State*, 2011 WL 1168414, at *5 & n.30 (Tex. Crim. App. Mar. 2, 2011) (quoting *Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010)).    Yet defense counsel's apparent strategy, reflected in their closing arguments, ignored Mendoza's conduct outside prison and focused exclusively on his conduct within. *See* RR25:38.    This strategy was not only legally mistaken but also unreasonable on this record.

The prosecution did not enter any evidence about Mendoza's conduct in jail in its case-in-chief.    The defense injected Mendoza's jail record into the case through Vigen, who testified that Mendoza's "bad behavior persists now even in the jail." RR24:120-21 ("just emotionally reactive," "causes trouble," a "nuisance").[4]    Then, on cross, Vigen elaborated:    Mendoza is "[r]eactive and impulsive," has "an explosive temper," RR24:151, and in jail is "sneaky and resourceful" and "takes pleasure" in hiding "things from the guards," RR24:175.    Vigen agreed that

---

[4] Vigen's last opinion was that "the Texas Department of Criminal Justice has the … capability to house and incarcerate [Mendoza] in such a manner that he will be a low or minimum risk for future violence in the prison system." RR24:127.  But Vigen began his testimony by conceding that he did not "have a lot of direct experience with correctional officers in Texas" and had "only been in one prison … in Texas."  RR24:127-28 (simply "assum[ing] that Texas is even better than Louisiana"); *see also* RR24:170-75 (cross).  Also speculative—if not affirmatively harmful—was Vigen's opinion that Mendoza might, at some future point, develop "the internal moral compass of an individual."  RR24:177-78; *see also* RR24:129-32.

Mendoza was not "just trying to get attention," but was "acting out his anger." RR24:152. He also agreed "that the best predictor of whether a person is going to be violent in prison is whether or not he's been violent in prison before." RR24:174. Foreshadowing the prosecution's rebuttal case, Vigen was asked whether he knew that Mendoza "came out of the rec yard and ran and attacked Inmate Melvin Johnson." RR24:152-53. And most devastating of all, Vigen "certainly agree[d]" that "in a free society [Mendoza] is a very dangerous individual," RR24:178, essentially conceding the future dangerousness issue required for a death sentence.

      b.   <u>The prosecution's case</u>.  The prosecution's case-in-chief focused exclusively on Mendoza's conduct outside prison. They adduced evidence showing that Mendoza had committed two robberies and sexually assaulted a minor. *See Mendoza*, 2008 WL 4803471, at *5-6. They also adduced evidence of Mendoza's misbehavior in school, at home, and among his friends. *Id*.

      The prosecution shifted gears in rebuttal, responding to Vigen's testimony by focusing on Mendoza's jail record. Their first rebuttal witness was Officer Hinton, who testified that Mendoza "approached" another inmate, Melvin Johnson, "in an aggressive fashion" and attacked him. RR24:230-31 (Mendoza "was the aggressor"). As explained below, there is good reason to believe that Hinton's testimony was false—Johnson later testified that *he* attacked Mendoza—but the jury got only a one-sided picture because defense counsel never interviewed Johnson.

The prosecution concluded its case by calling three more detention officers. Elias Deleon testified that he found "two inches" of "tin or aluminum" in Mendoza's cell, which Deleon thought was a "shank"—but also "may have been" "[t]he foil from an orange juice drink." RR24:242-44. Steven Smart testified that he found a "portion of [a] comb" in Mendoza's cell, which he thought "possibly" could be a shank. RR24:248-49. And Christy Davis testified that after going through Mendoza's "papers," she found rap lyrics, which the prosecution read to the jury. RR24:255-62.

c. <u>Closing</u>. Vigen's testimony featured prominently in the prosecution's closing. On the future dangerousness issue, the prosecution explained to the jury that under Texas law, the "question ask[s] you whether [Mendoza] is a danger to society, [to] anyone inside or outside that he may encounter"; "it's not just the prison system." RR25:21. "[Y]ou know the answer to that question," the prosecution continued, because "[h]is very own witness, Dr. Vigen … told you that this Defendant is dangerous in society." *Id*.

The same was true of mitigation. The prosecution asked the jury: "So why did he do it?" "Is there anything in his background that reduces his moral blameworthiness for what he's done?" RR25:24. Vigen again provided the answer: "Vigen looked and searched to try to find someone, something that caused

13

[Mendoza] to do this. He couldn't find it. He said it was missing. Where was it?" RR25:25.

The defense's closing was short. *See* RR25:39 ("I'm not going to use all my time."). Mendoza's counsel argued that, in prison, there might "at some point" be "hope for redemption" because Mendoza would no longer "have access to the culture that he did before." RR25:37-38. And so "when you answer … Special Issue Number 1, you have to remind yourself that you're dealing with that question in the context of prison," RR25:38—an argument that misstated Texas law, *supra* at 15. The defense never directly addressed the mitigation issue, although they briefly referenced some of the mitigating facts discussed above, RR25:32-35.

Vigen again featured prominently in the prosecution's rebuttal, as did Hinton. In response to defense counsel's suggestion that "the pattern of violence" would be broken in prison, the prosecution asked the jury to "remember what Dr. Vigen told you" about Mendoza's jail record, and emphasized that Mendoza "charge[d] Melvin Johnson and start[ed] to assault him." RR25:44-45. The prosecution also used Vigen's testimony to argue that no mitigating factors stood in the way of a death sentence. *See* RR25:46-47. Mendoza grew up in "a darn good home," but as "doctor [Vigen] told you, this isn't the way it always is" with capital defendants. RR25:47. Mendoza "ended up the way he wanted to because he chose it," prosecutors said: "[A]s Dr. Vigen told you yesterday, you see, you can do what you can do for a child,

14

but at a certain point the child takes what he wants to and he leaves behind what he wants to," which is what Mendoza did when he "chose to leave behind … good values." *Id*. In light of Mendoza's "depravity," the prosecution concluded, "[t]here's no mitigating circumstances here whatsoever." RR25:48.

d. Deliberations and verdict. Before returning their verdict, the jury asked the court to define terms in the future dangerousness special issue and for information about Mendoza's "criminal acts while in jail," including his "assault on other inmate." RR25:51. Ultimately, the jury returned a verdict of death. RR25:57-59.

### 3. *State post-trial proceedings*

The Texas Court of Criminal Appeals affirmed the conviction and sentence on direct appeal. *See Mendoza*, 2008 WL 4803471.

The trial court appointed Lydia Brandt as state habeas counsel; she raised seven claims in her petition, but not the claims at issue here. 1:SCHR:4-199. The court denied relief on all grounds, adopting the State's proposed findings of fact and conclusions of law virtually verbatim. *Compare* 4:SCHR:1693-1771, *with* 4:SCHR:1772-1850. The Court of Criminal Appeals summarily adopted these findings and denied relief. *Ex Parte Mendoza*, 2009 WL 1617814 (Tex. Crim. App. June 10, 2009) (per curiam).

## C.    Federal Proceedings

1.    The Eastern District of Texas appointed Brandt to continue her representation, ROA.18, and her federal habeas petition asserted the same seven claims that she had asserted in state court, ROA.26-208.    A magistrate judge recommended that all of Mendoza's claims be rejected, ROA.1723-44, and the district court agreed, ROA.1827-36.    But the district court did grant Mendoza a COA on "his first, second, fourth, and fifth claims."    ROA.1866-67.    Those claims together alleged that "trial counsel rendered ineffective assistance—by failing to obtain a comprehensive psycho-social history, by failing to consider, investigate, and present condition-of-the-mind evidence to negate the *mens rea* element in the guilt-determination phase of his trial, and by failing to adequately investigate and develop crucial mitigating evidence."    ROA.1867; *see also* ROA.1827-28.

2.    Mendoza's case proceeded to this Court, with Brandt handling the appeal. While Mendoza's appeal was pending, the Supreme Court decided *Martinez* and *Trevino*, which hold that Texas habeas petitioners can assert the ineffectiveness of state habeas counsel to excuse the procedural default of an underlying IATC claim. In light of these decisions, Mendoza moved for the appointment of conflict-free federal habeas counsel.    This Court granted Mendoza's motion.    It remanded the case to the district court "to appoint supplemental counsel" and "to consider in the first instance whether [Mendoza] can establish cause for the procedural default of

16

any ineffective-assistance-of-trial-counsel claims pursuant to *Martinez* and *Trevino* that he may raise, and if so, whether those claims merit relief." *Mendoza v. Stephens*, 783 F.3d 203, 203-04 (5th Cir. 2015) (per curiam) (Higginbotham, Owen, and Southwick, JJ.). The Court retained jurisdiction over Mendoza's non-*Martinez* claims and stayed proceedings. *Id*.

3. On remand, Jeff Haas was appointed federal habeas counsel, and he raised, in substance, two new IATC claims. *See* ROA.1934-35. The first claim alleged that trial counsel's presentation of Vigen was ineffective and that state habeas counsel was ineffective for failing to preserve the claim. *Id.* The second claim alleged that trial counsel's failure to uncover and rebut Hinton's false testimony was ineffective and that state habeas counsel was ineffective for failing to preserve this claim as well. ROA.1935.

Relevant to the second claim, Haas interviewed Johnson—the inmate Mendoza supposedly attacked—who swore in an affidavit that Hinton's testimony at trial was "patently false." ROA.1980. Johnson explained that *he* was the "aggressor," that Mendoza "didn't fight back," and that he (Johnson) "received an extra tray of food" after the attack, which he "figured was a bonus for [his] actions in fighting Mendoza." *Id.*

4. The district court denied relief on both claims. *See* ROA.2110. As to Vigen, the district court held that state habeas counsel was not ineffective because

17

she raised other "significant" issues implicating Vigen's testimony in support of the a claim that counsel "[failed] to prepare and present an adequate mitigation defense." ROA.2122.  The district court also held that trial counsel was not ineffective because they "gave a great deal of thought in developing a strategy focusing on the testimony of Dr. Vigen."  ROA.2127.  The district court never reached the issue of prejudice.

As to Hinton, the court readily acknowledged that "trial counsel's failure to investigate the alleged incident [wa]s concerning."  ROA.2132-33.  But the court held that the underlying claim lacked merit because trial counsel's failure to investigate Hinton's testimony was not prejudicial.  ROA.2133-34, 2136.  The district court summarily denied Mendoza's request for a COA.  ROA.2301.

5.  Mendoza moved for a COA in this Court on both claims.  While Mendoza's application was pending, the Supreme Court decided *Shinn*, holding that "a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel."  142 S. Ct. at 1734.  In practice, this means that Mendoza cannot establish his failure-to-investigate claim in federal court because the court cannot consider the Johnson affidavit, which is not in the state court record.  So Mendoza asked this Court to remand for the district court to enter (or at least consider in its discretion entering) a *Rhines* stay, which is the only way that Mendoza can litigate that claim on the merits.

18

6. On December 23, 2022, this Court granted Mendoza a COA, finding that both of Mendoza's IATC claims were "substantial." 28 U.S.C. § 2253(c)(2). The Court deferred a decision on whether to grant a COA on the ineffectiveness of Mendoza's state habeas counsel, which Mendoza must ultimately prove under *Martinez* and *Trevino* to overcome the procedural default.

## SUMMARY OF ARGUMENT

This is a capital case where the defense's key expert testified that the defendant lacked a moral compass, that traditional mitigation factors were absent, and that the defendant was dangerous. No reasonable capital defense attorney would offer such prejudicial testimony about their own client. The Court should accordingly reverse the district court's denial of habeas relief. At the very least, the Court should give Mendoza the opportunity to present his failure-to-investigate claim in state court. The overarching principle of habeas law is that criminal defendants should have one full and fair opportunity to litigate their claims on the merits. Mendoza has not.

I. Mendoza is entitled to habeas relief based on trial counsel's presentation of Vigen.

A. Trial counsel's presentation of Vigen was ineffective in at least three ways. No reasonable defense attorney would offer expert testimony that a death-eligible defendant lacks an internal compass. No reasonable defense attorney would offer

19

expert testimony that traditional mitigating factors were absent.  And no reasonable defense attorney would put on an expert who testifies that their client is very dangerous.   As the prosecution's closing arguments and the jury's questions demonstrate, these errors prejudiced Mendoza's defense.

B.  State habeas counsel was ineffective for defaulting this meritorious claim. There is no plausible strategic reason for omitting this claim from Mendoza's habeas petition.   The fact that counsel asserted weaker claims that she later abandoned confirms the absence of a strategic justification.

II.   In the alternative, Mendoza's substantial failure-to-investigate claim should be remanded to the district court for entry of a *Rhines* stay.   This Court's grant of a COA on this claim provides further support for a stay.

## STANDARDS OF REVIEW

This appeal involves two claims.   The first—concerning trial counsel's presentation of Vigen—is reviewed *de novo*.   That claim was procedurally defaulted, meaning the state court did not review it on the merits.   Accordingly, "the deferential AEDPA standards of review do not apply."  *Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir. 2003); *see also, e.g.*, *Gonzales v. Thaler*, 643 F.3d 425, 429-30 (5th Cir. 2011).   This Court reviews an ineffective-assistance-of-counsel claim *de novo*. *Rhodes v. Vannoy*, 751 F. App'x 524, 526 (5th Cir. 2018).

The second claim—involving trial counsel's failure to investigate Hinton's allegedly false testimony—is the subject of a motion to remand for a stay under *Rhines*. The entry of a *Rhines* stay is a matter of discretion committed to the district court, but where the three *Rhines* elements are satisfied, denying a stay "likely would be an abuse of discretion." 544 U.S. at 278.

## ARGUMENT

## I. MENDOZA IS ENTITLED TO HABEAS RELIEF BASED ON TRIAL COUNSEL'S PRESENTATION OF VIGEN

In evaluating whether Mendoza is entitled to relief based on trial counsel's presentation of Vigen, this Court must answer two questions: (i) whether Mendoza's IATC claim is meritorious; and (ii) whether state habeas counsel was ineffective for not asserting the claim. The answer to both questions is yes. Because the first inquiry informs the second—in that habeas counsel had no strategic justification for defaulting a meritorious claim—we begin with the merits of Mendoza's claim and then turn to state habeas counsel's performance.

### A. Trial Counsel's Presentation Of Vigen Was Ineffective

The guarantee of effective assistance of trial counsel is a "bedrock principle" that forms the very "foundation for our adversary system." *Martinez*, 566 U.S. at 12. Competent "[d]efense counsel tests the prosecution's case to ensure that the proceedings serve the function of adjudicating guilt or innocence, while protecting the rights of the person charged." *Id*. Thus, "[t]he benchmark for judging any claim

21

of ineffectiveness" is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). There are two familiar elements to a *Strickland* claim: deficiency and prejudice. Both are satisfied here.

      1.    *Counsel's presentation of an expert witness who proved the prosecution's case for death was objectively unreasonable*

Counsel's performance is deficient where it falls "below an objective standard of reasonableness," defined by prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quotations omitted). These norms are typically "reflected in American Bar Association standards and the like," which serve as "guides to determining what is reasonable." *Strickland*, 466 U.S. at 688. Ultimately, the touchstone of reasonableness is the exercise of professional judgment. *Id.* at 690-91; *see also Wiggins*, 539 U.S. at 521-22. While informed strategic judgment is due deference, "courts are not required to condone unreasonable decisions parading under the umbrella of strategy, or to fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (quotations omitted).

Counsel's presentation of Vigen contravenes several prevailing norms as reflected in professional guidelines. And their presentation of Vigen cannot be

rationalized as the product of reasonable strategic judgment because it so thoroughly—and foreseeably—undermined Mendoza's case for life. It did so in three overarching ways. First, no reasonable defense attorney in a death penalty case would call an expert to testify that the defendant has no moral compass or sense of self. Second, no reasonable trial counsel would call an expert to testify to the absence of mitigation. Third, no reasonable trial counsel would call an expert to testify that a defendant is dangerous. Any one of these errors would render counsel ineffective. Mendoza's appointed counsel made all three.

a. <u>No internal compass</u>. Trial counsel's most basic duty is "to advocate the defendant's cause." *Strickland,* 466 U.S. at 688. In a death penalty case, an expert psychologist can serve this function by humanizing the defendant. Here, counsel's presentation of Vigen did the opposite.

Vigen's "first opinion" was that Mendoza "has no internal sense of himself," has "no clear inner identity," and lacks "the internal compass that each of us has." RR24:117-18. The "self," Vigen explained, not only defines "who we are and what we're about" but allows us "to connect with other people in a way that we know who they are, and we can see their thoughts and see their feelings and know how they feel." RR24:118. According to Vigen, Mendoza lacks this sense of self and therefore lacks the ability to connect with others. *Id*. There was, Vigen testified, "an emptiness inside of him." RR24:130.

23

This testimony would make sense had it been presented by *the prosecution*. At its core, the death penalty calls for a "moral assessment," RR25:31 (defense closing); RR25:24 (prosecution closing); RR25:16 (charge), and a person without a "compass" or "identity" arguably is a person whose life is not worth sparing. Mendoza's counsel was tasked with humanizing Mendoza and arguing that his life had value, yet they presented testimony that dehumanized him.    RR24:118 (Mendoza lacks what the rest of "us" have).  It is incomprehensible that Mendoza's counsel chose to offer this testimony—let alone as their expert's first opinion.

Indeed, prosecutors in many capital cases have presented testimony substantively identical to that presented by the defense here.  Consider *Moore v. State*, 935 S.W.2d 124 (Tex. Crim. App. 1996).  There, the prosecution's expert psychiatrist testified that the defendant "lacks a conscience, is a continuing threat to society, and would continue to commit criminal acts of violence." *Id*. at 127.  This testimony supported the Texas Court of Criminal Appeals's holding that the evidence was "sufficient for a rational juror to find affirmatively that appellant is a continuing danger to society." *Id*.  The testimony found sufficient in *Moore* is materially indistinguishable from Vigen's testimony in every respect save one: there, the testimony was offered by the prosecution; here, it was offered by the defense.[5]

---

[5] Vigen likewise testified that Mendoza has no moral compass (i.e., conscience, RR24:65-66 (explaining testimony in voir dire)), and that he is dangerous to society. *Supra* at 14-15.  The balance of the expert's testimony in *Moore* is also substantively identical to Vigen's.  Like Vigen,

"No competent defense attorney would introduce such evidence about his own client." *Buck*, 580 U.S. at 119. Far from "humanizing" Mendoza, ABA Guidelines, 31 Hofstra L. Rev. at 1062, the defense used its most important witness to tell the jury that Mendoza was something short of human and that he lacked an "internal compass." That is simply "inexcusable." *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000); *see also*, *e.g., Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020) (finding deficient performance where defense counsel's evidence "backfired by bolstering the State's aggravation case"). No reasonable strategy could justify having a crucial defense expert testify—with the defendant's life on the line—that the defendant is unlike the rest of us in the most foundational ways.

b. <u>No mitigation</u>. In a death penalty case, trial counsel must "argue why death is not suitable punishment" by identifying mitigating factors that "explain or lessen the [defendant's] culpability." ABA Guidelines, 31 Hofstra L. Rev. at 1055-56, 1058. Mitigation evidence is especially important under Texas law: a jury cannot impose the death penalty unless they unanimously agree that there are no "sufficient mitigating … circumstances to warrant that a sentence of life imprisonment without

---

the expert "noted appellant's childhood displays of anger and violence and his lawless behavior." *Compare* 935 S.W.2d at 127, *with* RR24:158-60. Like Vigen, the expert "stated violence and anger were well integrated into [the defendant's] personality." *Compare* 935 S.W.2d at 127, *with* RR24:151, *supra* n.3. And while the expert in *Moore* testified that the defendant "would be manipulative, vindictive," and that his "behavior would carry over into prison society," 935 S.W.2d at 127, Vigen went one step further, testifying that Mendoza is a "chronic" liar, RR24:150, boasts "about being sneaky, about not getting caught," RR24:120, and that his "bad behavior" has *already* carried over into jail, *id*.

parole rather than a death sentence be imposed." Tex. Code Crim. Proc. art. 37.071, § 2(e)(1).

Mendoza's trial counsel understood the importance of mitigation evidence, promising the jury that they would "present evidence to you that will explain why Moises Mendoza acted the way he did." RR23:9-10. Yet Vigen testified that Mendoza's conduct was inexplicable. On two separate occasions, Vigen testified that the "traditional" mitigation factors do not explain Mendoza's conduct. RR24:156, 186-88. Vigen even told the jury that there was "something missing" because the typical mitigation factors "are just not present." RR24:186-88. And far from attempting to lessen Mendoza's culpability, Vigen testified that Mendoza had made a *choice*: Mendoza "could have chosen" to live a "responsible" life, RR24:156-57, but "[s]ometimes" kids "don't [listen]," RR24:121; *supra* at 10.

This testimony is not only inconceivable coming from a defense expert but also incomplete, ignoring other testimony that—as even Respondent recognizes—laid the foundation for a "very compelling case for mitigation." ROA.2025; *supra* at 11-13. But Vigen all but told the jury to ignore this compelling case. *See Rompilla v. Beard*, 545 U.S. 374, 389-90 (2005) (counsel's "unreasonableness" heightened by risk that testimony "would hamstring counsel's chosen defense"). And Vigen went even further, casting doubt on powerful mitigating evidence: he characterized Mendoza's remorse as "superficial" and testified that Mendoza did not fully

26

understand the "tremendous seriousness" of his crime. *Compare* RR24:130-31, *with Renteria v. State*, 206 S.W.3d 689, 697-98 (Tex. Crim. App. 2006) (vacating death sentence for erroneous exclusion of even "belated, in-custody expression of remorse made in the context of minimizing … responsibility"). Further still, Vigen's constant attacks on Mendoza's character, *supra* at 13 & n.3, undermined any effort to humanize him through his other fact witnesses.

All of this is "inexplicable." *Combs*, 205 F.3d at 286. "This testimony, from a *defense* witness, virtually precluded the jury from finding that [Mendoza] had established [the presence of] mitigating factors." *Magill v. Dugger*, 824 F.2d 879, 881-82, 889-90 (11th Cir. 1987). No competent attorney in a capital case would offer an expert who not only testified that traditional mitigating circumstances were "just not present," RR24:186-87, but also actively undermined a compelling factual case for mitigation.

c.  <u>Future dangerousness</u>. Counsel's presentation of Vigen on the future dangerousness special issue likewise cannot have been the product of reasoned strategic judgment. In short, the defense needed to argue that Mendoza would not be a future danger, yet Vigen testified that Mendoza was "very dangerous" in a free society and that he was already dangerous in jail.

"[T]he future-dangerousness special issue asks a jury to determine whether there is a probability that the defendant would constitute a continuing threat to

society whether in or out of prison." *Estrada*, 313 S.W.3d at 284 (quotations omitted). Texas courts have thus consistently rejected arguments that it should "be construed to ask a jury to determine whether a life-sentenced-without-parole capital defendant would be dangerous only to prison society." *Id*. at 283-84. Mendoza's counsel, however, focused exclusively on his dangerousness in prison, *supra* at 17, a strategy that appears to have been based on a misapprehension of Texas law. *See Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").

Not only was such a strategy legally infirm, but counsel's presentation of Vigen is inexplicable on this record. Recall that the prosecution presented no evidence of Mendoza's conduct in jail in their case-in-chief. Mendoza's counsel could have capitalized on this by arguing that Mendoza would not be dangerous in prison once separated from his prior life, and pointing to the prosecution's lack of evidence suggesting otherwise. *Cf. Woodfox v. Cain*, 609 F.3d 774, 811 (5th Cir. 2010) (it is reasonable to "hold the State to its burden"). Instead, however, defense counsel voluntarily chose to inject Mendoza's jail record into the case. They had Vigen testify that Mendoza's "bad behavior persists now even in the jail," and that despite being incarcerated, Mendoza continues to "cause[] trouble." RR24:120.

28

This decision prevented counsel from making the powerful argument above, and it also undermined their own narrative that Mendoza would no longer be a danger once freed from the dominating influence of his "depraved" friends, as the prosecution recognized at the time of trial, *infra* at 39.  "[I]t is unreasonable … to put an expert on the stand who will directly contradict the sole defense theory and render worthless other helpful testimony."  *Johnson v. Bagley*, 544 F.3d 592, 605 (6th Cir. 2008) (quotations and alterations omitted); *see also Rompilla*, 545 U.S. at 389-90.[6]

Counsel's decision also opened Vigen up to devastating cross examination and opened the case to ruinous rebuttal testimony about Mendoza's jail record.  *See Andrus*, 140 S. Ct. at 1884 (finding deficient performance where, *inter alia*, "the damaging exchange occurred only because defense counsel had called [the] witness in the first place"); ABA Guidelines, 31 Hofstra L. Rev. at 1064 (counsel must "tailor the presentation to avoid opening the door to damaging rebuttal evidence"); Guidelines and Standards for Texas Capital Counsel (Texas Guidelines), 69 Tex. B.J. 966, 975 (2006) (similar); *see also*, *e.g.*, *White v. Thaler*, 610 F.3d 890, 900 (5th Cir. 2010).

---

[6] This testimony also supported the prosecution's case for death directly, as the jury is permitted to consider dangerousness in prison as part of its abstract assessment. *See Buntion v. State*, 482 S.W.3d 58, 67-68 (Tex. Crim. App. 2016) (citing testimony from Vigen establishing the defendant's dangerousness); *see also Andrus*, 140 S. Ct. at 1884 (noting that the prosecution's case for future dangerousness "emphasized that Andrus had acted aggressively … in prison while awaiting trial"); RR25:21 (prosecution's closing).

Most notably, Vigen "certainly agree[d]" with the prosecution "that in a free society [Mendoza] is a *very dangerous individual*." RR24:178 (emphasis added). This testimony alone—especially coming from a defense expert—was likely sufficient for the jury to find future dangerousness, as it answered whether Mendoza was "the sort of person who if left to [his] own devices would hurt or kill again—a bad person." *Estrada*, 313 S.W. 3d at 281-82 & n.5 (quotations omitted). The prosecution understood the import of this testimony and the gravity of the error, arguing in closing that Mendoza's "very own witness, Dr. Vigen ... told you that [he] is dangerous in society …. So you know the answer to [the future dangerousness] question." RR25:21. But defense counsel did not recognize the mistake or at least did nothing to correct it. They did not attempt to contextualize Vigen's testimony on redirect and did not address it in closing, presumably because of their misinterpretation of the law.

Opening the case up to Mendoza's jail record on rebuttal similarly "hamstr[u]ng counsel's chosen defense." *Rompilla*, 545 U.S. at 390. The prosecution's rebuttal case—featuring Mendoza's (uninvestigated) assault on another inmate—reinforced Vigen's testimony that Mendoza was violent in jail, *supra* at 14-15, further undermining counsel's argument that Mendoza would no longer be dangerous in that controlled environment.[7]

---

[7] Counsel's decision to inject Mendoza's jail record into the case is intertwined with Mendoza's

Put simply, "[c]ounsel's introduction of seemingly *aggravating* evidence confirms the gaping distance between his performance at trial and objectively reasonable professional judgment." *Andrus*, 140 S. Ct. at 1883-84; *see also*, *e.g.*, *Combs*, 205 F.3d at 288-90 (finding counsel ineffective where defense witness's testimony "helped the prosecution to establish one of the elements of its case" and was "completely devastating to the defense"); *Manley v. Ross Corr. Inst.*, 314 F. App'x 776, 783-84 (6th Cir. 2008) (finding counsel ineffective when they called witness who "bolstered" the prosecution's case and "corroborat[ed] the prosecution's version of the facts"). As in *Buck*, "[n]o competent defense attorney would introduce" evidence supporting a finding that his client was a future danger, 580 U.S. at 119, especially in the context of this trial.

d.  <u>The district court's reasoning is wrong.</u>  The district court concluded that trial counsel's strategy concerning Vigen was "reasonable" because it was "based on [Vigen's] experience in other capital cases and because he had/could create great rapport with juries." ROA.2128-29. But that reasoning confuses the *weight* of Vigen's testimony with its *substance*. While there is no doubt that a jury would attach great weight to Vigen's testimony, the only question that matters here is

---

failure-to-investigate claim. Counsel could not have made a reasoned strategic judgment to open those floodgates without investigating Mendoza's jail record. Mendoza acknowledges that the Johnson affidavit—which establishes counsel's failure to investigate—is not in the state court record and thus cannot be considered after *Shinn*. Accordingly, if this Court is considering remanding for a *Rhines* stay, it should not adjudicate the Vigen-based claim until the failure-to-investigate claim is litigated in Texas state court.

whether it was reasonable to have such a powerful witness offer testimony that all but ensured Mendoza would be sentenced to death.  The district court never addressed that question.  And the district court's observation that a jury was likely to find Vigen credible only *underscores* the prejudice, as explained next.

2.   *Counsel's presentation of Vigen was severely prejudicial*

The district court never reached the issue of prejudice because it incorrectly concluded that Mendoza's trial counsel were effective.  This Court could thus remand the case to the district court for an assessment of prejudice, which would provide the Court with a reasoned opinion to review.  But there is no need for such a remand because the prejudice here is plain.

To establish prejudice, Mendoza need only demonstrate a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Miller v. Dretke*, 420 F.3d 356, 364 (5th Cir. 2005) (quoting *Strickland*, 466 U.S. at 694).  Because Mendoza's "death sentence required a unanimous jury recommendation, prejudice here requires only a reasonable probability that at least one juror would have" answered one of the special issues differently.  *Andrus*, 140 S. Ct. at 1886 (quotations and citations omitted); *supra* at 8.  The test is not whether the jury "could have heard it all and still have decided on the death penalty"; it is whether "the likelihood of a different result"—here, a single holdout juror on either special issue—"is sufficient to undermine confidence in the

32

outcome actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (quotations omitted).

The prejudice here is obvious. After settling on a defense strategy featuring Vigen as their star witness, ROA.638-40, counsel promised the jury in opening remarks that they would "present evidence to you that will explain why Moises Mendoza acted the way he did." RR23:9-10. Yet Vigen testified that the usual mitigation factors that "more often than not" explain a capital defendant's conduct were simply "missing." RR24:186-88; RR24:156; *see Wiggins*, 539 U.S. at 536 (noting in finding prejudice that counsel told the sentencing jury that they would hear mitigation "but never followed up on this suggestion"). Compounding this error, Vigen laid the blame at Mendoza's feet, testifying that Mendoza "could have chosen" to "pattern his life after his" successful siblings but ultimately did not. RR24:156-57.

This testimony was especially damaging coming from an expert psychologist for the defense. Mental health experts play a crucial role at the punishment phase, typically—though not here—explaining for the jury the psychological factors that motivated or explain the defendant's behavior and moral culpability. *See, e.g.*, Fed. Jud. Ctr., *Resource Guide for Managing Capital Cases* § II.C, 2004 WL 1873850 (2004); ABA Guidelines, 31 Hofstra L. Rev. at 1055-56, 1061-62. The "effect" of expert testimony is only "heightened" when presented by the defense. *Buck*, 580

33

U.S. at 121.    As a "medical expert," Vigen's testimony bore "the court's imprimatur."  *Id*.  And as a defense expert, Vigen's testimony was "in the nature of an admission against interest, more likely to be taken [by the jury] at face value." *Id*.; *see also, e.g.*, *Flores v. Johnson*, 210 F.3d 456, 465-66 (5th Cir. 2000) (Garza, J., concurring).  Here, moreover, counsel's entire "strategy [was] to present [the] defense through Dr. Vigen."  ROA.639.

Given all this, it is no surprise that the prosecution seized on Vigen in closing. Responding directly to defense counsel's opening promise, the prosecution argued to the jury:  "Dr. Vigen looked and searched to try to find someone, something that caused [Mendoza] to do this.  He couldn't find it.  He said it was missing.  Where was it?"  RR25:25; *see also* RR25:47 ("As the doctor told you, this isn't the way it always is.").    The prosecution likewise hammered home Vigen's opinion that Mendoza could have chosen a different path, *see* RR25:26 ("This case is about choices."); RR25:47 (citing Vigen as support for argument that Mendoza "chose to leave behind the good values" he was taught), appealing to multiple jurors' statements during voir dire about the importance of choice, *see, e.g.*, RR9:102-03, RR13:52-53, RR18:60-61.  The prosecution's repeated use of Vigen's testimony is powerful evidence of prejudice:  even during the trial, without the benefit of hindsight, reasonable lawyers from the prosecution recognized its devastating impact.  *See Buck*, 580 U.S. at 108; *White*, 610 F.3d at 906; *Combs*, 205 F.3d at 290;

34

*see also, e.g.*, *United States v. Jones*, 930 F.3d 366, 379-80 (5th Cir. 2019).

The same is true of Vigen's testimony on future dangerousness. When an expert "testifies that a particular defendant would be a continuing threat to society, juries are almost always persuaded." *Flores*, 210 F.3d at 466 (Garza, J., concurring) (quotations omitted); *see Buck*, 580 U.S. at 121-22. Vigen thus "gave the prosecution a gift by expressing his belief in [Mendoza's] future dangerousness." *Stevens v. McBride*, 489 F.3d 883, 898 (7th Cir. 2007); *see* RR24:178, *supra* at 33.

Counsel also had Vigen testify that Mendoza continued to be dangerous in jail even though "the prosecution itself" had not introduced the issue "as an aggravating circumstance" in its case-in-chief. *Stevens*, 489 F.3d at 898. This decision had a number of devastating consequences, even beyond bolstering the prosecution's case. *Supra* at 32-34 & n.6. Crucially, Vigen's testimony shattered the defense's *own* theory that Mendoza would no longer be dangerous once he was isolated from his "depraved" friends. *See Combs*, 205 F.3d at 290 (finding prejudice based in part on presentation of expert testimony that "substantially undercut" the "defense theory"). And it invited the prosecution to present Mendoza's jail record, including Hinton's (uninvestigated) account of Mendoza's alleged attack on Johnson. *See Arizona v. Fulminante*, 499 U.S. 279, 300 (1991); *Hooper v. Mullin*, 314 F.3d 1162, 1171 (10th Cir. 2002).

As with Vigen's "no mitigation" testimony, the prosecution immediately

35

understood the significance of Vigen's future dangerousness testimony. The prosecution argued in closing that the jury "kn[e]w the answer" to the future dangerousness question because Mendoza's "very own witness, Dr. Vigen … told you that this Defendant is dangerous in society." RR25:21. And the prosecution likewise recognized that Vigen's testimony about Mendoza's jail record undermined defense counsel's theory that "the pattern of violence" would be "broken" in prison. RR25:44-45 ("[D]o you remember what Dr. Vigen told you?"). The jury, too, confirmed that this testimony prejudiced Mendoza: during its deliberations, the jury specifically asked for evidence about Mendoza's record, RR25:51, confirming beyond question that this evidence was key to their vote for death. *See Buck*, 580 U.S. at 120-21; *Estrada*, 313 S.W.3d at 286-87.

Perhaps just as damning was Vigen's testimony about Mendoza's alleged character. The sheer volume of harmful testimony is staggering, *supra* at 13 & n.3, but a few key pieces stand out. In a proceeding that focused largely on the defendant's character, Vigen testified that Mendoza has an "explosive temper" and "acts without thinking." RR24:150-51; *see also* RR25:46 (prosecution's closing) ("He has no regard for human life, and he will do whatever pleases him because, as the doctor told you, he's impulsive, he's got a terrible explosive temper, and he will do it anytime he wants to anywhere he wants to."). In a proceeding where the difference between life and death can be something as simple as a genuine display

of remorse, Vigen testified that Mendoza's remorse was only "superficial." *Supra* at 12-13. And in a proceeding that, at its core, calls for a moral judgment about the worth of a person's life, Vigen's very first opinion was that Mendoza had no moral compass, had no sense of self, and was different from the rest of "us" in the most important ways. *Supra* at 9.

This testimony—from a defense witness, no less—ensured that not even a single juror would dissent on either of the special issues, thus sealing Mendoza's fate.

**B.    State Habeas Counsel's Ineffectiveness Excuses Mendoza's Procedural Default**

Despite the merit of Mendoza's IATC claim, state habeas counsel did not raise it in state court. The failure to raise this claim constitutes a procedural default, which ordinarily precludes federal habeas relief. *Trevino*, 569 U.S. at 421. But "[t]he doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from the violation of federal law." *Martinez*, 566 U.S. at 10. In *Martinez* and *Trevino*, the Supreme Court held that where, as here, a state prisoner's first opportunity to assert an IATC claim is in state habeas proceedings, the ineffectiveness of state habeas counsel may excuse a procedural default. *Martinez*, 566 U.S. at 14; *Trevino*, 569 U.S. at 423.

37

To satisfy *Martinez* and *Trevino*, a Texas petitioner like Mendoza must prove that: (i) the underlying IATC claim is substantial; and (ii) state habeas counsel was ineffective for not asserting it. *See Trevino*, 569 U.S. at 423; *Ramey v. Davis*, 942 F.3d 241, 255 (5th Cir. 2019). Both elements are satisfied here.

### 1.   *Mendoza's IATC claim is substantial*

This Court's grant of a COA on Mendoza's IATC claim shows why the "claim is a substantial one, which is to say … that the claim has some merit." *Martinez*, 566 U.S. at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003), "describing standards for certificates of appealability"). That is because "the test for whether the underlying claim is substantial is the same as the one for granting a COA." *Murphy v. Davis*, 732 F. App'x 249, 259-60 (5th Cir. 2018) (per curiam); *see also Trevino v. Davis*, 861 F.3d 545, 548-49 (5th Cir. 2017); *Crustinger v. Stephens*, 576 F. App'x 422, 430 (5th Cir. 2014) (per curiam); *accord Dorsey v. Vandergriff*, 30 F.4th 752, 756 (8th Cir. 2022) (collecting cases). Although this Court's grant of a COA may not be binding on the panel on the issue of substantiality, *but cf. Trevino*, 861 F.3d at 549, it stands to reason that Mendoza's IATC claim is substantial for the same reasons that this Court concluded at the COA stage that it has some merit. Indeed, as demonstrated above, the claim has more than just some merit—it is meritorious. *Supra* Part I.A.

38

2.    *Mendoza's state habeas counsel was ineffective for defaulting his substantial IATC claim*[8]

The second element—ineffectiveness of state habeas counsel—is also clearly met.  There is no plausible strategic justification for Mendoza's counsel to have defaulted his substantial IATC claim.

a.  State habeas counsel's performance is evaluated "under the standards of *Strickland*."  *Martinez*, 566 U.S. at 14.  "The proper measure of attorney performance" under *Strickland* is objective "reasonableness under prevailing professional norms," *Wiggins*, 539 U.S. at 521 (alteration and quotations omitted), typically reflected in professional guidelines, *see supra* at 25.

The professional guidelines applicable when Mendoza's counsel filed the state habeas petition in October 2007 made clear that she "ha[d] a duty … to raise and preserve all arguably meritorious issues."  ABA Guidelines, 31 Hofstra L. Rev.

---

[8] This Court deferred a decision on whether to grant a COA on Mendoza's assertion that state habeas counsel was ineffective for defaulting this claim.  For brevity, Mendoza will only address the merits.  If Mendoza's argument is meritorious, then the less-demanding COA standard will necessarily be satisfied.  If Mendoza's argument is not meritorious, then he will not be entitled to relief.  For similar reasons, Mendoza does not separately address prejudice from state habeas counsel's omission.  There is tension in this Court's case law as to whether a petitioner independently must show "a reasonable probability that he would have been granted state habeas relief," *Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014), or whether a petitioner can demonstrate prejudice if the underlying IATC claim is substantial, *Nelson v. Davis*, 952 F.3d 651, 673 (5th Cir. 2020).  Most courts follow the latter approach to avoid the "incongruity" of requiring the petitioner to prove "that the defaulted claim is itself meritorious" to overcome the default.  *Owens v. Stirling*, 967 F.3d 396, 423 (4th Cir. 2020) (collecting cases); *cf. Mamou v. Davis*, 742 F. App'x 820, 828 (5th Cir. 2018) (observing that under *Newbury*, overcoming a default "largely merges with the merits of the underlying claim").  Either way, Mendoza can demonstrate prejudice.  Mendoza's claim is substantial.  And he *is* entitled to relief on the merits, as explained in Part I.A.

at 1086; *see also* Texas Guidelines, 69 Tex. B.J. at 982 (habeas "counsel must be especially sensitive to the need to preserve all potential issues for later review by including them in the first state application for writ of habeas corpus"). "Effective … counsel," the Supreme Court has since emphasized, "preserves claims to be considered" in "habeas proceedings." *Martinez*, 566 U.S. at 12.

This obligation to preserve arguably meritorious (i.e., substantial) claims was especially crucial in 2007, before *Martinez* and *Trevino*. At that time, the omission of an IATC claim from a state habeas petition meant that no court—state or federal— would ever consider the claim on the merits. *See Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017). In state court, there was a "near certainty that any claim not presented in the first state application for writ of habeas corpus will be waived or otherwise defeated by defenses such as procedural default." Texas Guidelines, 69 Tex. B.J. at 982. And in federal court, the claim would not be cognizable because, under *Coleman v. Thompson*, 501 U.S. 722 (1991), even "an attorney's errors in a postconviction proceeding [would] not qualify [to excuse the] default." *Martinez*, 566 U.S. at 8. So a petitioner's only way to vindicate his bedrock right to effective assistance of trial counsel was to assert the claim in state habeas, and there could be no strategic justification for denying a defendant that singular opportunity by omitting an arguably meritorious claim from the habeas petition. Thus, this Court has held on at least two occasions that "[t]he mere fact that state habeas counsel

failed to raise" a "potentially meritorious IATC claim[] evidences …

ineffectiveness." *Washington v. Davis*, 715 F. App'x 380, 385 (5th Cir. 2017) (per

curiam) (COA context); *see also Murphy*, 732 F. App'x at 266 (same).

This is not to say that the omission of an arguably meritorious IATC claim

from a state habeas petition, standing alone, is automatically ineffective. Even

diligent habeas counsel might not assert a meritorious claim that was not readily

apparent at the time—for example, if the claim depended on evidence that could not

reasonably have been discovered or was based on a development in the law that

could not have been anticipated. *See, e.g., Ayestas v. Davis*, 933 F.3d 384, 392-95

(5th Cir. 2019). But those were not the circumstances here. And it is impossible to

envision a strategic justification for consciously omitting an arguably meritorious

IATC claim in a pre-*Martinez* and *Trevino* environment, where the consequence of

omitting the claim was that no court would ever hear it.

b.    Ignoring the professional norms applicable to state habeas counsel,

Respondent argued in opposition to Mendoza's application for a COA that Mendoza

needed to prove that his IATC claim "was clearly stronger than issues that [his]

counsel did present." COA Opp. 23 (quotations omitted). There are three flaws in

Respondent's argument. First, Mendoza easily satisfies that standard. Second, the

record does not support Respondent's hypothesis that Mendoza's counsel engaged

in strategic winnowing. And third, Respondent invoked the wrong standard

altogether. He asked this Court to apply the standard for *appellate* counsel, but this Court is reviewing the performance of state habeas counsel, and appellate and habeas counsel have different obligations.

i. This Court can save for another day the question of what standard governs the performance of habeas counsel because Mendoza easily satisfies even Respondent's heightened standard. Mendoza's IATC claim is substantial. But state habeas counsel raised claims in the petition that, by her own reckoning, were weaker than Mendoza's IATC claim.

Specifically, habeas counsel asserted two claims in the petition relating to the trial court's exclusion of an expert whose formula predicted that Mendoza had a 23.8% chance of committing serious violence in prison. 1:SCHR:161-96.[9] Counsel asserted both of these claims in her federal habeas petition. ROA.170-93. But even she ultimately recognized their weakness and abandoned them in federal court by electing not to pursue a COA. *See* ROA.1857. The same is true of state habeas counsel's actual innocence claim, which the district court also dismissed on procedural grounds because it was defective. *See* ROA.1832; *see also* 1:SCHR:76-

---

[9] Both of these claims were weak, and one was especially so. Habeas counsel's sixth claim focused on the exclusion of expert testimony at trial, but that claim in substance was procedurally barred and "not cognizable on [state] habeas." 4:SCHR:1845-47. When counsel asserted the same claim in her federal habeas petition, both the magistrate judge and district court agreed. *See* ROA.1833-35. In other words, counsel asserted a weak claim that was based on "unpreserved trial error," *Davila*, 137 S. Ct. at 2067, instead of preserving Mendoza's substantial IATC claim. That is manifestly unreasonable.

86; ROA.93 (federal habeas petition); ROA.1857 (motion for COA, dropping actual innocence claim).  Mendoza's IATC claim is "clearly stronger" than the claims that habeas counsel brought but later abandoned, as the actual course of this litigation illustrates.

In his opposition, Respondent ignored these three abandoned claims and instead argued that habeas counsel was not ineffective because Mendoza's IATC claim was not clearly stronger than the four claims for which the district court granted a COA.  *See* COA Opp. at 23-24.  But that argument distorts even Respondent's test.  Under that test, the question is not whether Mendoza's IATC claim is clearly stronger than *every* claim that counsel asserted; it is whether the defaulted claim is "clearly stronger than *any* of the claims raised by appellate counsel."  *Diaz v. Quarterman*, 228 F. App'x 417, 427 (5th Cir. 2007) (emphasis added); *accord Smith v. Robbins*, 528 U.S. 259, 288 (2000) (test is whether abandoned claim "was clearly stronger than issues that counsel did present").  And counsel here presented three issues that were clearly weaker than Mendoza's current IATC claim.  Respondent's version of his test is also perverse:  it would require Mendoza to argue that his current claim is "clearly stronger" than other claims that are still pending before this Court.  Respondent's effort to pit Mendoza's viable claims against one another—and to force Mendoza to rank them—should be rejected.

43

Respondent's argument is also illogical. His position seems to be that because Mendoza's counsel raised some substantial claims, she reasonably could have decided to default other substantial claims, even if they were roughly comparable in strength. That does not follow. And there certainly is no support under prevailing professional norms for the notion that counsel can omit one substantial claim as long as they assert another. Just the opposite. *Supra* at 43. Indeed, Mendoza's claim is "meritorious," so even under Respondent's framework, there is no need to compare the strength of claims at all. *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003).

The district court's conclusion that Mendoza's habeas counsel was not ineffective is unpersuasive for similar reasons. The district court believed that habeas counsel was not ineffective because she asserted *other* claims that were factually related to Vigen's testimony—namely, that trial counsel failed to investigate, develop, and present an adequate mitigation defense. *See* ROA.2122-25. As a threshold matter, the district court was wrong to assume that counsel could have made a strategic choice to abandon a substantial IATC claim given that Mendoza's only opportunity to have that claim considered was in state habeas. *Supra* at 43-44. Putting this error aside, that counsel raised some claims that relied in part on Vigen's testimony does not mean that counsel made a strategic choice to abandon *this* claim. If anything, the opposite is true: state habeas counsel's

44

knowledge of the problems with Vigen's testimony makes her failure to raise this claim all the more confounding.

ii. The suggestion that Mendoza's habeas counsel strategically defaulted his claim—omitting it somehow to improve the chances that other claims in the petition would be accepted—also fails because the record does not support that habeas counsel engaged in any strategic winnowing. Mendoza's state habeas petition included seven claims and spanned 183 pages, not counting exhibits. There is no indication that counsel strategically omitted any claims from that substantial filing in an effort "to maximize the likelihood" that the state habeas court would grant the petition. *Robbins*, 528 U.S. at 288; *cf. Simmons v. Napier*, 626 F. App'x 129, 132-33 (6th Cir. 2015) (observing that "seven independent grounds for" relief are too many on appeal). Indeed, counsel stated at argument that if she was aware of an additional claim, she "would have run it." 6/18/14 Arg. Tr. at 24.[10] Contrary to Respondent's suggestion, this Court is "not required to … fabricate tactical decisions on behalf of counsel when it appears on the face of the record that counsel made no strategic decision at all." *Richards*, 566 F.3d at 564 (quotations omitted).

iii. Finally, Respondent's entire framework is wrong. The standards of reasonableness under *Strickland* will vary with the stage of the proceeding because

---

[10] Judge Higginbotham likewise observed at argument that "what counsel did do was articulate every claim that she knew, I'm sure, because we see that on the record here." *Id*. at 50.

counsel has different obligations at different stages in the representation. As to appeals, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). That is why the Supreme Court has held that "[d]eclining to raise a claim on appeal … is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." *Davila*, 137 S. Ct. at 2067; *see Robbins*, 528 U.S. at 288.

But the obligations and expectations of habeas counsel are very different. *See Davila*, 137 S. Ct. at 2065-68 (distinguishing appellate and trial errors). There is no historic tradition of habeas counsel strategically defaulting substantial claims. On the contrary, habeas counsel are expected to raise and preserve substantial claims. *Supra* at 43. This expectation reflects the grave consequences of default and the role of state habeas counsel in ensuring that arguably "meritorious claims of trial error receive review by at least one state or federal court." *Davila*, 137 S. Ct. at 2067. When an appellate lawyer strategically omits a preserved claim, there is no risk that the claim will forever go unreviewed "because at least 'one court' will have [already] considered the claim on the merits." *Id*. (quoting *Martinez*, 566 U.S. at 11). But that would not be true if state habeas counsel were to deliberately omit an IATC claim. In that circumstance, habeas counsel's decision would mean that a potentially

46

meritorious IATC claim would "never be reviewed by any court, state or federal." *Id.* at 2066.

So while it is reasonable to assume that an appellate lawyer, having already lost in the trial court, might strategically omit a claim from an appeal brief, *cf. Robbins*, 528 U.S. at 288, the same is not true of state habeas counsel.[11] It is unreasonable to assume that state habeas counsel's omission of an arguably meritorious IATC claim was a strategic choice when the merits of that claim have never been tested. No reasonable habeas lawyer would deny her client the opportunity to have at least one court consider a substantial IATC claim on the merits.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD REMAND FOR ENTRY OF A *RHINES* STAY

Mendoza has never had a full and fair opportunity to litigate the merits of his claim that trial counsel were ineffective for not investigating Hinton's allegedly false testimony. This is undisputed. If the Court does not grant Mendoza habeas relief outright, it should in the alternative grant Mendoza's motion to remand for entry (or consideration) of a *Rhines* stay so that Mendoza can litigate this claim in state court.

Recall that counsel's theory at trial was that Mendoza would not be a future danger within the confines of prison. *Supra* at 17. Before presenting that theory,

---

[11] Unpreserved claims of error likewise are often not asserted on appeal because of procedural impediments. *See Davila*, 137 S. Ct. at 2067.

counsel should, at minimum, have investigated Mendoza's jail record. *See, e.g.*, *Rompilla*, 545 U.S. at 385 ("counsel ha[s] a duty to make all reasonable effort to learn what they could about [an aggravating] offense"). Inexplicably, counsel did not. Because of that lack of basic diligence, counsel did not discover that the prosecution's first—and most powerful—rebuttal witness appears to have testified falsely. Officer Hinton testified that Mendoza attacked another inmate, Melvin Johnson. RR24:230-31. But when conflict-free federal habeas counsel interviewed Johnson, Johnson explained that *he*, not Mendoza, started the fight, and that the fight was orchestrated by prison guards. ROA.1980. State counsel's failure to investigate was obviously prejudicial, as Mendoza's jail conduct and alleged assault became a focus for the prosecution and for the jury during deliberations. RR25:51 (jury question); *supra* at 17-18; *see also* App. for COA at 49-51.

Neither Mendoza's trial counsel nor his state habeas counsel discovered this crucial evidence, so Mendoza asserted this claim for the time in his federal habeas petition. But after *Shinn*, Mendoza cannot substantiate this claim in federal court. *Shinn* held that federal habeas courts cannot consider evidence that is not already in the state court record, and the Johnson affidavit is not in the state court record because none of Mendoza's state court lawyers interviewed Johnson.

Mendoza moved this Court to remand this case to the district court for entry of a stay to allow him to litigate the claim on the merits in Texas state court. That

procedure was endorsed by the Supreme Court in *Rhines*.  Under *Rhines*, federal courts should stay habeas proceedings to allow petitioners to litigate their claims in state court where, as here, a petitioner: (i) has good cause for the failure to present a claim in state court; (ii) the claim is not plainly meritless; and (iii) there is no indication of intentionally dilatory litigation tactics.  *Rhines*, 544 U.S. at 277-78.

Mendoza's *Rhines* motion is fully briefed.  We write here to emphasize two points—one substantive, one procedural—related to this Court's grant of a COA.

First, this Court's grant of a COA on Mendoza's failure-to-investigate claim, although not conclusive, supports Mendoza's arguments under *Rhines*.  If, as this Court held, reasonable jurists could debate the merit of Mendoza's claim, then it should follow that the claim is not "plainly meritless."  The Court's grant of a COA also lends support to Mendoza's arguments that there is a "good cause" for a stay. "[T]he *Rhines* standard for IAC-based cause is not any more demanding than the cause standard articulated in *Martinez*."  *Blake v. Baker*, 745 F.3d 977, 984 (9th Cir. 2014).[12]  And as explained above, the default of a substantial IATC claim in the circumstances here establishes cause under *Martinez*—and hence also good cause under *Rhines*.

---

[12] This makes sense.  *Rhines* allows a return to state court whereas *Martinez* allows a petitioner to bypass state court altogether.  *Bolin v. Baker*, 994 F.3d 1154, 1157 (9th Cir. 2021).

Second, because Mendoza at this time no longer seeks to litigate his failure-to-investigate claim in federal court, this Court need not decide whether to grant a COA on the alleged ineffectiveness of state habeas counsel for not preserving this claim; habeas counsel's procedural default is no longer at issue. Mendoza seeks to litigate in state court the merits of his claim that trial counsel were ineffective.

## CONCLUSION

The Court should grant Mendoza habeas relief and reverse the judgment below. In the alternative, the Court should vacate and remand with instructions to enter or consider entering a *Rhines* stay.

Respectfully submitted,

Anton Metlitsky
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Tel: (212) 326-2291
ametlitsky@omm.com

/s/ *Jason Zarrow*
Jason Zarrow
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Tel: (213) 430-8367
jzarrow@omm.com

Melissa C. Cassel
O'MELVENY & MYERS LLP
Two Embarcadero Center
San Francisco, CA 94111
Tel: (415) 984-8839
mcassel@omm.com

*Counsel for Moises Sandoval Mendoza, Petitioner-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 10, 2023, an electronic copy of the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit and served on counsel for Respondent-Appellee using the appellate CM/ECF system.

/s/ *Jason Zarrow*
Jason Zarrow

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit and the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,139 words.

This document complies with the typeface requirements of Fed. R. App. P. 32 (a)(7)(B)(i) and Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally-spaced typeface using Microsoft Word in size 14 font in Times New Roman.

/s/ *Jason Zarrow*
Jason Zarrow
Counsel for Petitioner-
Appellant Moises Mendoza

Dated:  March 10, 2023